1 EDWARD R. REINES (Bar No. 135960)
edward.reines@weil.com
2 DEREK C. WALTER (Bar No. 246322)
derek.walter@weil.com
3 WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
4 201 Redwood Shores Parkway
Redwood Shores, CA 94065
5 Telephone: (650) 802-3000
Facsimile: (650) 802-3100
6

7 Attorneys for Plaintiffs
ILLUMINA, INC and ILLUMINA CAMBRIDGE LTD.
8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILLUMINA, Inc.<br>ILLUMINA CAMBRIDGE LTD.,<br><br>Plaintiffs,<br><br>vs.<br><br>QIAGEN, N.V.<br>QIAGEN GmbH<br>QIAGEN Gaithersburg, Inc.<br>QIAGEN Sciences, LLC,<br>QIAGEN Inc. (USA)<br>QIAGEN Redwood City, Inc.<br>Intelligent Bio-Systems, Inc.<br><br>Defendants. | Case No. 3:16-cv-02788-WHA<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Judge: Hon. William Alsup<br>Date: Thursday, August 25, 2016<br>Time: 8:00 A.M.** |

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | ARGUMENT | | 2 |
| | A. | This Motion Is Well Timed | 2 |
| | B. | Qiagen's Attempt To Deny That There Is A Risk Of Irreparable Harm Is Meritless | 4 |
| | C. | Qiagen Fails To Raise A Substantial Question That The Claims Are Obvious | 6 |
| | D. | Post-IPR Estoppel Applies to Qiagen | 10 |
| | E. | Qiagen Has Not Raised A Substantial Question On Enablement | 12 |
| III. | CONCLUSION | | 15 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Application of Boller*,
　332 F.2d 382 (1964) ................................................................................................................ 15

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
　750 F.2d 1569 (Fed. Cir. 1984) ............................................................................................... 15

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
　135 S. Ct. 1293 (2015) .............................................................................................................. 8

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
　664 F.3d 922 (Fed. Cir. 2012) ................................................................................................... 5

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
　821 F.3d 1359 (Fed. Cir. 2016) ................................................................................................. 8

*Streck, Inc. v. Research & Diagnostics Sys, Inc.*,
　665 F.3d 1269, 1290 (Fed. Cir. 2012) ..................................................................................... 14

*Union Carbide Chems .& Plastics Tech. Corp. v Shell Oil Co*,
　308 F.3d 1167 (Fed. Cir. 2002) ............................................................................................... 14

*Warner Lambert Co. v. Teva Pharm. USA, Inc.*,
　No. CIV. A. 99-922 DRD, 2007 WL 4233015 (D.N.J. Nov. 29, 2007) ................................... 15

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
　782 F.2d 995 (Fed.Cir.1986) ..................................................................................................... 2

**Statutes**

35 U.S.C. §315(e)(2) ............................................................................................................... 2, 10

# I. INTRODUCTION

Qiagen does not deny that its new GeneReader DNA sequencer infringes Illumina's '537 patent. Qiagen's infringement is not an accident. Illumina's patented azido technology was too tempting. ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████ Exh. 1 at 138:9-139:13. Qiagen also does not deny that it failed to invalidate the '537 patent before a three judge panel of the Patent Trial and Appeal Board ("the PTAB") and at the Federal Circuit. It does not deny that its elaborate invalidity challenges were fruitless attempts to clear the legal path for GeneReader because it had no alternative to Illumina's patented azido chemistry.

In the wake of Qiagen's focused—but failed—efforts to dodge or invalidate the '537 patent, Qiagen's main arguments on this motion understandably eschew the merits. The heart of Qiagen's Opposition is that there is no need for an injunction because its GeneReader roll-out is not yet causing "imminent irreparable harm" to Illumina. Dkt. No. 71-4 at 1. Qiagen argues that GeneReader has not yet captured much market share. Qiagen thus contends that this motion is premature. At the same time, Qiagen argues that Illumina has waited too long. These contradictory positions are meritless. The timing of this motion is spot-on; it is not too late. Illumina filed this motion only months after the GeneReader was first announced and only two weeks after Qiagen's CEO declared in his quarterly earnings call that the GeneReader "uptake is much broader and much faster than what we initially had anticipated." Dkt. No. 14-3 at 16.

Likewise, the motion is not too early. In the face of this motion, Qiagen's CEO announced that we "are very confident about our position to market it [GeneReader] very aggressively going forward." Exh. 2 at 13. Allowing a "very aggressive" roll-out of an infringing product makes no sense. Even leaving aside the irreparable harm that inevitably results from this kind of competitor activity, there is a serious risk of irreparable harm to the labs in hospitals that are the target of Qiagen's marketing efforts. ████████████████████

████████████████████████████████████████████████████████████████████

1 █████████████████████████████████████████████████████████████████████████████

2 █████████████████████████████████████████████████████████████████████████████

3 █████████████████████████████████████████████████████████████████████████████

█████ Qiagen's insistence that substantial irreparable harm must occur ***before*** a preliminary injunction is warranted has it backwards. The purpose of a preliminary injunction is to prevent such harm.

████████████████████████████████████████████████

█████████████████████ one "who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed.Cir.1986). It is also inconsistent with Qiagen's public pronouncements that this case poses no risk to it:

> I would like to highlight that's a very, very small area of intellectual property that's under dispute. And so no impact in anyway either on our revenue outlook, or on new products introduction capabilities.

Exh. 2 at 15.

Finally, the weakness of Qiagen's liability position supports an injunction. Qiagen's invalidity argument is that the '537 patent is obvious. Yet, this is exactly the argument it lost in the IPR proceeding. Qiagen is statutorily estopped from asserting any obviousness "ground that the petitioner raised or reasonably could have raised" in the IPR proceeding. *See* 35 U.S.C. §315(e)(2). Qiagen's obviousness arguments to this Court are either arguments already rejected by the PTAB and Federal Circuit or improper new arguments it "reasonably could have raised." At the very same time Qiagen argues that the inventions of the '537 patent are well within the skill in the art, it half-heartedly alleges that they are not even enabled to these same skilled workers.

A preliminary injunction against the infringing GeneReader DNA sequencer should be entered so long as that product is dependent on Illumina's patented azido technology.

## II. ARGUMENT

### A. This Motion Is Well Timed

Qiagen alleges that Illumina should have brought this motion sooner. Dkt. No. 71-4 at 18.

This argument is meritless. The crux of Qiagen's delay argument is that Illumina was aware of the GeneReader program since 2012. But knowledge of the GeneReader program did not give rise to some kind of duty to bring a preliminary injunction motion before the product even existed in commercial form. The GeneReader program was plagued by chronic delays, accompanied by repeated public announcements of chemistry makeovers. This called into serious question whether the product would ever be released and, if so, with what chemistry.

████████████████████████████████████████████████████████████ Exh. 1 at 69:20-70:13. Year after year, Qiagen announced the product, only to delay it again. *Id.* It is unreasonable to expect Illumina to have brought a preliminary injunction motion against a product that might never be released.

Qiagen implies that Illumina knew that Qiagen planned to use its patented azido chemistry as far back as 2012 because that is what its predecessor IBS had used. However, during the 2012-15 time period when the GeneReader program was suffering delays, Qiagen publicly announced that its chemistry was being overhauled and remained unsettled. For example, on July 23, 2013, Qiagen reported that its GeneReader team changed virtually everything—including the chemistry—to move *away* from the old IBS technology:

> According to Dietrich Hauffe, senior vice president and head of Qiagen's life sciences business area, the company changed "pretty much everything" around the original sequencing platform built by IBS, including the chemistry, fluidics, and mechanics.

Exh. 3 at 2. And a year later, on May 13, 2014, when Qiagen delayed the release of GeneReader again, it justified that delay because of more chemistry changes: the "company had to adjust certain chemistries and other components of the workflow, [the Qiagen CEO] said, which has 'pushed out timelines of systems integration, the design lock, and therefore the overall timelines.'" Exh. 4 at 1.

In November 2015, Qiagen announced the introduction of GeneReader yet again and this motion followed in May 2016. Qiagen alleges that even this constituted undue "delay." But given the history of delays in the GeneReader program from 2012 to 2015, it was prudent to await hard evidence that Qiagen was serious about this product launch before filing a preliminary injunction

motion. Confirmation that GeneReader was a true threat arrived in Qiagen's April 28, 2016 earnings call when Qiagen's CEO reported that GeneReader sales were ahead of plan: "uptake is much broader and much faster than what we [Qiagen] initially had anticipated and put in our plan. We expect that trend to continue." Dkt. No. 14-3 at 16. By mid-May the Federal Circuit affirmed the rejection of Qiagen's invalidity attack on the '537 patent and this motion was ripe and promptly filed. There was no delay at all.

### B. Qiagen's Attempt To Deny That There Is A Risk Of Irreparable Harm Is Meritless

Illumina's Mark Van Oene explained in his declaration that the industry perceives GeneReader as "imitative of lllumina desktop sequencing products," citing an article observing that Qiagen's sequencing-by-synthesis method works the "same way as lllumina's machines." Dkt. No. 17-9 ¶ 31. Qiagen never denies that it is perceived as imitating Illumina's chemistry.

Mr. Van Oene also explained why and how GeneReader creates a risk of irreparable harm. *Id* ¶¶ 42-47. Among other things, Qiagen has pre-existing customer relationships with the many clinical labs in hospitals that make up this emerging new market for DNA sequencers. Exh. 5 at 14 ("Almost every pathology lab or any clinical research lab around the world is a customer of ours."). Although Qiagen has unique access to these clinical labs, if GeneReader does not perform well, that could discourage these labs from adopting these emerging DNA sequencing techniques for cancer and other tests. *Id.* ¶¶ 27-28, 44, 46.

This is a real issue. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ If the clinical market is turned off to the DNA sequencing approach to hospital testing, that would cause irreparable harm to Illumina.

If, on the other hand, Qiagen's focused effort to sell to its many existing clinical lab customers is successful (through GeneReader quality improvements or other otherwise), the

---

irreparable harm to Illumina of losing these customers long-term is manifest. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930–31 (Fed. Cir. 2012) (affirming a finding of irreparable harm based on "damage to [patentee's] price, reputation, and business opportunities"). It is undisputed that the clinical lab market is an emerging one. As Qiagen's submission shows, and its executive admits, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

Qiagen is right that Illumina's brand is fantastic. ████████████████████
████████████████████████████████████████████████████ But that is all the more reason why having to compete with an imitator now can have irreparable effects. There is no guarantee that down the road the other competitors in this emerging market will be better positioned to win sales that Illumina would win now. Because these clinical labs are likely to be loyal to their vendor, this is a critical time for Illumina to forge such relationships. Qiagen's infringing and imitative intrusion in the market is thus classic irreparable harm.

Irreparable harm is also caused by Qiagen's disruptive competitive tactics that necessarily degrade the market environment for Illumina. ██████████████████████████████████
████████████████████████████████████████████████████████████████████████████

[redacted] Besides ignoring that the purpose of a preliminary injunction is to protect against irreparable harm, this position ignores that Qiagen's CEO told the press in April that Qiagen would sell 100 sequencers this year and "that the pipeline and the commitments and also the indications that we're receiving will allow us to get there." Exh. 5 at 17; *see also* Exh. 1 [Arnold Tr.] at 95:4-18. [redacted]

Although Qiagen cites various Illumina documents to suggest that Qiagen is not a major threat to Illumina's overall business this year,[1] [redacted] This marketplace behavior threatens imminent irreparable harm.

**C.     Qiagen Fails To Raise A Substantial Question That The Claims Are Obvious**

Qiagen's main challenge on liability is to allege the '537 patent is invalid as obvious. To show that the '537 patent is obvious, Qiagen would have to show that it was obvious to employ an azido group as the protecting group in DNA methods such as sequencing-by-synthesis (SBS). It failed at this task before the PTAB and the Federal Circuit, and its effort to do so here is barred by these prior decisions and thus does not raise a substantial issue.

A basic understanding of how Qiagen lost the IPR is necessary. In its IPR petition, Qiagen

---

[1] In fact, Illumina's internal documents show that it has long since viewed Qiagen as a potential threat that it is taking seriously. *See* Exh. 6.

1 relied upon two different references (Ju and Tsien) to establish the DNA SBS method to which it
2 proposed the azido protecting group would be added, as required by the claims of the '537 patent.
3 Dkt. No. 14-9 at 6-7. To find a teaching of an azido protecting group to combine with Ju or
4 Tsien's SBS method, Qiagen relied upon alternatively Zavgorodny or Greene & Wuts. *Id.* at 21-
5 23. Qiagen treated these references interchangeably, and argued that both Zavgorodny and Greene
6 & Wuts teach that an azido protecting group would be useful for the SBS methods taught by Ju
7 and Tsien, relying on the same rationale for each reference. *Compare, e.g.*, *id.* at 24-27 *with id.* at
8 27-29; *see also* Exh. 7 [Metzker Tr.] at 118:3-19.

The PTAB granted the petition to consider whether Zavgorodny taught an azido protecting group for use in SBS as disclosed in Ju and Tsien. *See* Dkt. No. 14-10 at 7-12. It decided ***not*** to grant the petition as to the Greene & Wuts combinations because it found those redundant of the Zavgorodny combinations. *Id.* at 15. After trial on the Zavgorodny combinations, the PTAB found that both Ju and Tsien taught that the protecting group would have to be recognized as efficiently removable for the combination to be obvious. *See* Dkt. No. 14-11 at 11-12, 20. But it found that Zavgorodny taught away from the invention because it taught that azido groups would ***not*** be efficiently removable. *Id.* at 12-14, 21. Even though the PTAB had not considered Green & Wuts as part of a formal combination, it ***did*** consider Greene & Wuts and a related reference (Loubinoux) to confirm whether a person skilled in the art would have considered an azido protecting group to be a good candidate for use with Ju and Tsien. *Id.* at 21. It concluded that azido groups would be considered a ***poor*** candidate because of their inefficiency and thus the patented inventions were not obvious. *Id.* at 12-14, 21.

On appeal, the Federal Circuit was squarely presented with the question of whether either Greene & Wuts or its related reference Loubinoux taught that azido protecting groups would have been viewed by persons skilled in the art as a good, efficient candidate for use with SBS. This is important because Qiagen's obviousness theory here relies on Greene &Wuts to teach the azido protecting group—and also invokes the related Loubinoux publication as a "background" reference. *See* Dkt. No. 76 ¶ 80.

In a critical passage, the Federal Circuit specifically held that Greene & Wuts (and

Loubinoux) would *discourage* a person of skill in the art from trying the invention:

> In its decision the [PTAB] acknowledged two background references presented by Illumina: Loubinoux, which teaches that azidomethyl methyl groups are removed from phenols with modest efficiency (60–80% yield), and Greene & Wuts, which teaches that removal of an azidomethyl methyl group from the 3# hydroxyl position of a deoxyribonucleotide moiety is likely to proceed with even lower efficiency.
>
> These references [Loubinoux and Greene & Wuts] support a conclusion that the claimed efficiency that allegedly motivated the combination would not be achieved and that a person of ordinary skill in this field would not have been motivated to use the azidomethyl group of Zavgorodny as a "protecting group [that] can be modified or removed to expose a 3'-[hydroxyl] group" of a nucleic acid molecule, as the claim requires. ***This is so because the azidomethyl group would have been expected to perform inefficiently in that role.***

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369-70 (Fed. Cir. 2016) (citation omitted) (emphasis supplied).

Qiagen's attempt to rely on Greene & Wuts for its prior art combinations is thus doomed legally. Under well-established principles of issue preclusion, Qiagen may not re-litigate the issue of whether Green & Wuts teaches that azido groups are a poor candidate for combination with the SBS methods of Ju and Tsien. That issue was actually litigated in the prior proceeding, the parties were given a full and fair opportunity to do so, and the issue provided the basis for the final judgment. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1299 (2015) (setting forth issues preclusion elements and finding "consistent with principles of law that apply in innumerable contexts, we hold that a court should give preclusive effect to TTAB decisions if the ordinary elements of issue preclusion are met").

Here, Qiagen's expert admitted that this critical issue was decided *against* Qiagen in the IPR proceedings, but that he simply disagrees with the PTAB and Federal Circuit:

> **Q.** [W]hat the Fed Circuit found as a matter of fact is that the azidomethyl group would have been expected to perform ***inefficiently*** as a removal group by a person of ordinary skill in the art based on the Greene reference; correct?
>
> **A.** Well, I think it's Greene and then Loubinoux; right? Because Loubinoux –
>
> **Q.** Greene and Loubinoux; you're right.
>
> **A.** And Greene and Loubinoux. And, again, I disagree because they're [the Federal Circuit and PTAB] using the wrong metric.

Exh. 7 at 127:9-20 (emphasis supplied). Qiagen's attempt to relitigate this issue in this proceeding

1    is legally improper. Because it has been conclusively found that Greene & Wuts (and Qiagen's
2    "background" reference Loubinoux) teach that one of skill in the art would *not* view azido groups
3    as a good candidate for combination with Ju and Tsien, Qiagen's attempt to rely on those
4    references necessarily fails as a matter of law.

5    Moreover, the PTAB and Federal Circuit's decisions were correct on the facts. Qiagen's
6    obviousness theories rely on Greene & Wuts (and Loubinoux) to teach azido protecting groups,
7    but those references discourage the use of azido protecting groups with DNA.[2] Greene & Wuts is
8    a 749-page treatise that covers over a thousand potential protecting groups, including for the kind
9    of hydroxyl groups that are in DNA nucleotides and nucleosides. *See* Exh. 7 [Metzker Tr.] at
10   155:4-7. Yet, the two-sentence disclosure of an azidomethyl protecting group that Qiagen relies
11   upon from Greene & Wuts (*see* Dkt. No. 77-8 at 260), is not in a chapter related to the types of
12   hydroxyl groups that are in nucleotides and nucleosides (aliphatic alcohols), but in a different
13   chapter related to aromatic alcohols, as Dr. Metzker confirmed at deposition. *Id.* at 155:25-157:2,
14   158:25-160:6. Dr. Metzker made clear that the skilled artisan "absolutely" would have known that
15   nucleotides and nucleosides are not in the class of compounds covered by the chapter upon which
16   Qiagen relies. *Id.* at 162:18-22. Neither Qiagen nor its expert offer any persuasive explanation for
17   why skilled artisans would have turned to a chapter in Greene & Wuts related to compounds
18   *different* from nucleotides and nucleosides to select a protecting group for use with nucleotides
19   and nucleosides when there is a chapter specifically for DNA-type hydroxyl groups that identifies
20   scores of potential protecting group candidates.

21   Although Dr. Metzker was aware of Greene & Wuts long before 2002, and was very

---

[2] Qiagen's expert states in passing in the background portion of his declaration that Tsien also suggests azido as a possible protecting group. *See* Dkt. No. 76 ¶¶ 64-65. Qiagen's IPR expert, however, confirmed unambiguously that Tsien is *not* disclosing a removable protecting group at all, but is instead disclosing a non-cleavable chemical group that cannot be removed to generate a 3'-OH. *See* Exh. 8 [Branchaud Tr.] at 100:20-101:6. At deposition, Qiagen's current expert, Dr. Metzker, further confirmed that Tsien is referring to nucleotides where the azido is attached directly to a carbon. *See* Exh. 7 [Metzker Tr.] at 102:23-104:7. It is undisputed that such azidos cannot act as reversible protecting groups, and neither the PTAB nor the Federal Circuit has ever indicated that Tsien's disclosure of an azido group suggests the invention of the '537 patent.

involved with identifying potential protecting groups for use in SBS methods during the 1990s, he confirmed that as of 2002 he had not even heard of azidomethyl as a protecting group. *Id.* at 30:18-31:3 ("**Q.** In 2002, were you aware of azido groups as a potential candidate as a blocking group for the 3 prime sugar? **A.** No."); *see also id* at 42:7-12, 47:1-48:3, 68:23-69:1. Likewise, Dr. Metzker confirmed that in the 1990s there was a "need in the field for a blocking group that would work with sequencing by synthesis" and that there were "at least half a dozen" research groups working on this. *Id.* at 44:16-21, 48:20-49:2. None of these researchers ever turned to Greene & Wuts and suggested the use of an azidomethyl group, as claimed in the '537 patent.

Even if one gives Qiagen the benefit of the doubt and assumes that the skilled artisan would have looked to Greene & Wuts for a disclosure of an azidomethyl protecting group, it would still not render the invention of the '537 patent obvious. The only techniques disclosed in Greene & Wuts for removing the azidomethyl protecting group rely upon chemical reagents that would undisputedly destroy DNA, as Dr. Metzker confirmed. *Id.* at 160:21-161:18, 162:2-10. This shows yet again that Greene & Wuts *discourages* the use of an azido protecting group with nucleic acids.

As to Qiagen's suggestion that skilled artisans would combine Greene & Wuts with Ju or Tsien for single-stranded DNA labeling, this argument is estopped, as documented below. Moreover, none of Greene & Wuts, Tsien, or Ju address single-stranded DNA labeling. Neither Qiagen nor its expert points to any specific non-sequencing teachings, such as single-stranded DNA labeling, in either Ju or Tsien that would have motivated one of skill in the art to combine Ju or Tsien with Green & Wuts to produce a labeled nucleotide for use in a step-wise synthesis of single-stranded DNA using a terminal transferase enzyme.

**D.      Post-IPR Estoppel Applies to Qiagen**

Pursuant to 35 U.S.C. § 315(e), once an IPR has resulted in a final written decision, both the Petitioner in an IPR and its privies may not later contend in district court that a claim is invalid based on any ground that the Petitioner "raised or could have raised" in the IPR. § 315(e).

This means that the only invalidity arguments that defendant Intelligent Bio-Systems, Inc. ("IBS"), who was the petitioner in the failed IPR of the '537 patent, may now raise are arguments

that it could *not* have raised in the IPR. This rule applies equally to each of the Qiagen defendants because they are all privies of IBS. All of the defendants are related corporate entities that are participating in the development and marketing of the GeneReader product and all are under the control of Qiagen, N.V. *See* Dkt. No. 37-4. IBS expressly identified its Qiagen corporate parents as real parties-in-interest in the IPR. *See* Dkt. No. 14-9 at 2. Qiagen even informed its expert that post-IPR estoppel applies. *See* Exh. 7 at 59:4-60:2; 61:24-62:10.

Qiagen now seizes upon the PTAB's decision that its obviousness theories based on Greene & Wuts were "redundant," and that estoppel does not apply. Qiagen's expert testified that only obviousness theories actually in IBS's IPR petition but not considered by the PTAB can now be presented:

> **Q.** The assumption you were given as to what opinions you could and couldn't give in view of the failed petition was that the invalidity theories that you were going to express in this case had to be those which were expressed in the petition; is that correct? In the petition and not considered?
> **A.** In the petition and not considered; that's correct.

*Id.* at 61:24-62:10.

In this light, it is critical to note that Qiagen's obviousness case here does not merely rely on Greene & Wuts. It relies upon *fourteen* references (Exhs. H-N and P-V) that were *not* part of its 2013 IPR petition, but that undisputedly could have been. *See id.* at 63:4-67:7. Insofar as Qiagen's arguments rely upon art that was not included in the Petition, such arguments are estopped. Qiagen acknowledges that it is seeking to use its new art to present new arguments because it asserts that "its prior IPR loss does not pose even a precedential hurdle for QIAGEN's *current* obviousness argument." Dkt. No. 71-4 at 12 (emphasis added).

Qiagen's argument is that, even if Greene & Wuts would not have been combined with Ju or Tsien for the purpose of SBS (a safe assumption in view of the Federal Circuit decision), it would have been obvious to combine them for *single-stranded DNA labeling*. *See id.* at 14. None of Greene & Wuts, Ju, or Tsien, however, are about DNA labeling, and there is no DNA labeling theory anywhere in Qiagen's IPR petition. The PTAB already found that this theory and many other theories that Qiagen now seeks to present were not in the petition. *See, e.g.*, Dkt. No.

14-11 at 14-18; *see also* Exh. 12 at 8-9 (IBS's attempt to submit a labeling theory in IPR reply); Exh. 13 ¶¶ 31-38 (IBS's expert's attempt to submit a labeling theory in IPR reply). A review of Qiagen's expert witness declaration reveals that Qiagen's labeling argument is in fact based primarily on either the Chang or Quake references, which were not in Qiagen's IPR petition. *See* Dkt. No. 76 ¶¶ 71-74; *see also* Exh. 7 [Metzker Tr.] at 51:4-19. But these references and Qiagen's labelling theory generally clearly could have been presented in Qiagen's IPR Petition and Qiagen does not deny that. Estoppel thus applies to this new theory and these new references. Simply put, Qiagen's new arguments are estopped and its old arguments have already been rejected.

### E. Qiagen Has Not Raised A Substantial Question On Enablement

Even though Qiagen contends that a person of ordinary skill in the art is knowledgeable enough that the claims of the '537 patent would have been obvious, it argues as a fallback that this same skilled artisan would not be able to use the claimed subject matter without undue experimentation. Qiagen does not deny that the primary embodiments of the '537 patent—used both in the GeneReader and in Illumina's products—are fully enabled. Qiagen thus focuses on peripheral, commercially unimportant embodiments and argues that the claims are invalid for being too broad. None of Qiagen's enablement arguments raise a substantial question.

First, Qiagen contends that the claims are not enabled because they refer to incorporation of a "nucleotide or nucleoside" into a nucleic acid. According to Qiagen only nucleotides can be incorporated into nucleic acids so the concept of incorporation of a "nucleoside" in the method of the '537 patent is inconceivable. Dkt. No. 71-4 at 16. This argument is a gimmick. Qiagen's expert from the IPR found no problem with the concept, asserting that it was "generally known" how to make "modified nucleotides *or nucleosides* that could be used in labeling methods*, such as those claimed in the '537 Patent*." Exh. 10 [Branchaud Decl.] ¶ 32 (emphasis supplied). Nucleosides are a component of nucleotides. *See* Exh. 7 [Metzker Tr.] at 105:12-17 ("**Q.** What is the difference between nucleotides and nucleosides as you used those terms? **A.** Well, a nucleotide has a base, a sugar or one or more phosphates. And a nucleoside only has a base or a sugar."). Thus, if a nucleotide can be incorporated into a nucleic acid, a nucleoside within the nucleotide is necessarily incorporated. The '537 patent even states that "reference to nucleotides

is also intended to be applicable to nucleosides." Dkt. No. 14-4 at 5:64-66.

It is a common claim drafting technique in the nucleic acid field to state that either "nucleotides or nucleosides" are incorporated into a nucleic acid. This is so true that Qiagen's own expert used this exact technique in one of his claims. *See* Exh. 9 at 36; *id.* at claim 18. When shown this in deposition, he took the litigation-driven position that this meant his own patent was also invalid as not enabled because supposedly only nucleotides, but not nucleosides, can be incorporated in nucleic acids:

> **Q.** So you're saying your claim is broken?
> **A.** This claim has an embodiment that is not functional. You cannot incorporate a nucleoside with a polymerase.
> **Q.** Essentially you're saying Claim 18 of your LaserGen application has the same problem that you're accusing the '537 patent of having?
> **A.** This claim may have the same problem.

Exh. 7 at 111:6-13. Many others have filed for patents with similar teachings and claims, as reflected in the highlighted patent filings attached hereto as Exhibit 11. This is because the terms nucleoside and nucleotide are used interchangeably in the art, as Dr. Metzker confirmed at deposition. Exh. 7 at 77:14-78:13, 184:1-22, 187:24-189:10,190:2-8. Further, Dr. Metzker's opinion that enzymes cannot incorporate a nucleoside into nucleic acid is inconsistent with his deposition testimony that enzymes can indeed do so through a phosphorylation process. *See id.* at 185:7-187:17; Exh. 14.

Qiagen's remaining two arguments assume that there are embodiments of all the claims that are unquestionably enabled. To try to raise an issue, Qiagen argues that the claims are invalid because they supposedly cover other embodiments that ***might*** not work.[3] To raise a substantial

---

[3] Qiagen does not deny that the full scope of the claims can be practiced using chemical synthesis techniques. Thus, all of Qiagen's arguments about inoperative embodiments rely upon construing the claims as being limited to enzymatic incorporation, such that they exclude non-enzymatic chemical synthesis techniques for incorporation. *See* Dkt. No. 71-4 at 16 n.5; Dkt. No. 76 ¶¶ 53-55. Qiagen's attempt to exclude such techniques to support its enablement case is without merit. Dr. Metzker confirmed at deposition that the '537 patent states that nucleosides are "useful in the invention." Exh. 7 at 74:6-18. He further confirmed that nucleosides are compatible with only chemical synthesis, not enzymatic extension. *See id.* at 82:6-83:8. It is thus difficult to see how someone of skill in the art reading the '537 patent could exclude chemical synthesis from the scope of the claims.

question of invalidity, however, Qiagen's arguments must be supported by evidence, not mere speculation and conclusory allegations. *See, e.g.*, *Union Carbide Chems .& Plastics Tech. Corp. v Shell Oil Co*, 308 F.3d 1167, 1186 (Fed. Cir. 2002) (expert testimony alleging lack of enablement due to certain embodiments not meeting the claims was "general and vague" and thus insufficient to support a jury verdict of lack of enablement); *Streck, Inc. v. Research & Diagnostics Sys, Inc.*, 665 F.3d 1269, 1290 (Fed. Cir. 2012) (affirming JMOL of no lack of enablement where there was only "conclusory expert assertions" in support of the invalidity argument).

Here, Qiagen's expert simply speculates that the claims ***might*** encompass inoperative embodiments. *See* Dkt. No. 76 ¶¶ 97-105. Neither Qiagen nor its expert, however, identifies even a single specific compound within the scope of the claims that would not work. Indeed, Qiagen's expert did not try to prove any compounds were unworkable even though he testified that such testing would have been easy to perform:

> **Q.** In 2016, if you wanted to test one of the compounds shown in Figure 3 with an azido group to see if it worked as a blocking group according to the invention, what would you have to put – how much energy, effort would that take?
> **A.** In 2016?
> **Q.** Yeah.
> **A.** Not very much at all, because, in fact, we published in 2012 how to make it and what enzyme you would use to incorporate it. So we actually gave you the answer and just follow what we said. You would get – you could demonstrate incorporation.

Exh. 7 [Metzker Tr.] at 92:6-19. Qiagen has been trying to attack this patent for years and has been aware of this motion for months. Its failure to present any proof of non-enabled compounds within the scope of the claims speaks volumes. There simply is no basis for Qiagen's speculation that some compounds might not work.

Even had Qiagen shown that some inoperative embodiments might exist, its arguments fail on the law. In its landmark *Atlas Powder* enablement decision, the Federal Circuit faced an argument that, although the primary embodiments may be enabled, that there might be some embodiments of the claims that do not work or do not work well. The Court rejected this enablement argument squarely, explaining that it "is not a function of the claims to specifically

exclude…possible inoperative substances." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984). As established by *Atlas Powder,* the general rule is that claims do not fail merely because they encompass inoperative embodiments. *See, e.g.*, *Warner Lambert Co. v. Teva Pharm. USA, Inc.*, No. CIV. A. 99-922 DRD, 2007 WL 4233015, at *15 (D.N.J. Nov. 29, 2007) ("A patent can support extremely broad claims even if some of the embodiments are inoperative."); *Application of Boller*, 332 F.2d 382, 387 (1964) ("[I]t is well settled that claims need not expressly exclude possibly inoperative examples.").

Failing to follow this law, Qiagen and its expert wrongly assumed that a claim is invalid merely because it encompasses embodiments that may be inoperative:

> **Q.** And is it your understanding that a claim is invalid as lacking enablement if there are inoperative embodiments encompassed within the scope of the claim?
> **A.** Yes, I have that understanding.

Exh. 7 at 128:3-10. All of Qiagen's enablement arguments about potential inoperative embodiments are thus based on a faulty legal standard and fail for this reason alone.

Ultimately, Qiagen's inoperative embodiment arguments all fall flat because there is no suggestion that the alleged inoperative embodiments within the scope of the claims would confuse or misdirect a skilled artisan such that he or she would be unable to use the claimed invention. There is no argument that this field is unpredictable—Qiagen cannot make that argument because its primary argument is obviousness. Qiagen's expert confirmed that the person of ordinary skill with the '537 patent in hand would recognize that the azido protecting group could be used successfully and that making the azidomethyl group work would be within ordinary skill. *See id.* at 84:18-85:16, 89:20-91:6. Claim 6 covers this specific compound and no others, so even if Qiagen's arguments about the breadth of the claims were viable for other claims, they do not have any force relative to that narrower dependent claim. *See id.* at 147:19-23 ("So there's just one structure that's described in Claim 6.").

### III. CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin Qiagen from further infringement of the '537 patent.

| | | |
|---|---|---|
| Dated: May 24, 2016 | | Respectfully submitted,<br>WEIL, GOTSHAL & MANGES LLP<br>Edward R. Reines<br>Derek C. Walter<br><br>By: _____*/s/ Edward R. Reines*_____<br>Edward R. Reines<br>Attorneys for Plaintiff<br>ILLUMINA, INC.<br>ILLUMINA CAMBRIDGE, LTD. |